No. 24-1594

In The

# United States Court of Appeals
# for the Third Circuit

---

ANDY KIM, *et al.*,

*Plaintiffs-Appellees*,

v.

CHRISTINE GIORDANO HANLON, in her capacity as Monmouth County Clerk, *et al.*,

*Defendants*,

CAMDEN COUNTY DEMOCRATIC COMMITTEE,

*Intervenor-Defendant-Appellant*.

---

On Appeal from the United States District Court
for the District of New Jersey, No. 3:24-cv-01098-ZNQ-TJB

---

**BRIEF *AMICUS CURIAE* OF MIDDLESEX COUNTY DEMOCRATIC
ORGANIZATION IN SUPPORT OF APPELLANTS**

---

NEAL KUMAR KATYAL
SEAN MAROTTA
ERIC S. ROYTMAN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Middlesex County
Democratic Organization*

April 6, 2022

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel

for *amici curiae* certifies that the Middlesex County Democratic Organization does

not have a parent corporation or a corporation that owns 10% or more of its stock.

<div align="right">

s/ Neal Kumar Katyal
Neal Kumar Katyal

</div>

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................... iii

INTERESTS OF AMICUS CURIAE......................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ..........................................................................................5

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS
      BECAUSE PLAINTIFFS' INTEREST IN PREFERENTIAL BALLOT
      PLACEMENT IS NOT A FIRST AMENDMENT INTEREST THAT
      THE NEW JERSEY BRACKETING AND BALLOT-POSITION
      LAWS INJURE ...................................................................................6

II.   THE DISTRICT COURT DID NOT ADEQUATELY CONSIDER
      THE HARM TO LOCAL POLITICAL ORGANIZATIONS AND THE
      VOTERS THAT RELY ON POLITICAL ENDORSEMENTS WHEN
      BALANCING THE POTENTIAL HARMS OF GRANTING THE
      INJUNCTION...................................................................................20

CONCLUSION .....................................................................................25

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES:**

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)......................................................................*passim*

*Associated Builders & Contractors W. Pa. v. Community Coll.*
  *of Allegheny Cnty.*,
   81 F.4th 279 (3d Cir. 2023) ..................................................8

*Board of Election Comm'rs of Chicago v. Libertarian Party of Ill.*,
   591 F.2d 22 (7th Cir. 1979) .................................................15

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000)...............................................................8

*Burdick v. Takushi*,
   504 U.S. 428 (1992)..............................................................*passim*

*California Democratic Party v. Jones*,
   530 U.S. 567 (2000)...............................................................20

*Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*,
   501 F.2d 917 (3d Cir. 1974) ........................................20, 24

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
   489 U.S. 214 (1989)..................................................7, 23, 25

*Gillen v. Sheil*,
   416 A.2d 935 (N.J. Super. Ct. Law Div. 1980)....................5

*Gonidakis v. LaRose*,
   599 F. Supp. 3d 642 (S.D. Ohio 2022)..............................16

*Democratic-Republican Org. of N.J. v. Guadagno*,
   700 F.3d 130 (3d Cir. 2012) ...............................................19

# TABLE OF AUTHORITIES—CONTINUED

Page

*Guerrero-Sanchez v. Warden of N.Y. Cnty. Prison*,
   905 F.3d 208 (3d Cir. 2018) ...................................................................16

*J. Supor & Son Trucking & Rigging Co., Inc. v. Trucking Emps.*
   *of N. Jersey Welfare Fund*,
   30 F.4th 179 (3d Cir. 2022) ....................................................................16

*Jacobson v. Florida Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) .............................................................15

*Jenness v. Fortson*,
   403 U.S. 431 (1971).................................................................................13

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
   567 U.S. 298 (2012)...................................................................................7

*Libertarian Party of Virginia v. Alcorn*,
   826 F.3d 708 (4th Cir. 2016) ..............................................10, 11, 12, 13

*Moskowitz v. Grogan*,
   243 A.2d 280 (N.J. Super. Ct. App. Div. 1968) .....................................5

*Nelson v. Warner*,
   12 F.4th 376 (4th Cir. 2021) ..................................................................11

*New All. Party v. New York State Bd. of Elections*,
   861 F. Supp. 282 (S.D.N.Y. 1994) ........................................................11

*Parker v. Montgomery Cnty. Corr. Facility/Bus. Office Manager*,
   870 F.3d 144 (3d Cir. 2017) ...................................................................16

*Quaremba v. Allan*,
   334 A.2d 321 (N.J. 1975) ..............................................................5, 13, 24

# TABLE OF AUTHORITIES—CONTINUED

<u>Page</u>

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) .................................................................20

*Richardson v. Caputo*,
  214 A.2d 385 (N.J. 1965) ...........................................................13, 24

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984)...........................................................................8

*Tashjian v. Republican Party of Connecticut*,
  479 U.S. 208 (1986).........................................................................23

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997).........................................................................7

**STATUTES:**

N.J. Stat. Ann. § 19:1-1 .......................................................................18

N.J. Stat. Ann. § 19:14-12....................................................................18

N.J. Stat. Ann. § 19:23-18....................................................................8

N.J. Stat. Ann. § 19:23-24..............................................................8, 19

N.J. Stat. Ann. § 19:23-26.1.................................................................8

N.J. Stat. Ann. § 19:49-2......................................................................8

**RULE:**

Fed. R. Civ. P. 29(a)(4)(E).....................................................................1

# TABLE OF AUTHORITIES—CONTINUED

Page

**OTHER AUTHORITIES:**

Andrea Benjamin & Alexis Miller, *Picking Winners: How Political Organizations Influence Local Elections*, 55 Urb. Aff. Rev. 643 (2017) ........................................................................................................22

Elisabeth R. Gerber & Justin H. Phillips, *Development Ballot Measures, Interest Group Endorsement, and the Political Geography of Growth Preferences*, 47 Am. J. of Pol. Sci. 625 (2003) ...................................22

Monika L. McDermott, *Not for Members Only: Group Endorsements as Electoral Information Cues*, 59 Pol. Rsch. Q. 249 (2006) .................................21

NJTV News, *Republicans Concerned About Down-Ballot Effect* (Oct. 27, 2016) .................................................................................................17

Brett M. Pugach, *The County Line: The Law and Politics of Ballot Positioning in New Jersey*, 72 Rutgers Univ. L. Rev. 629 (2020) ......................5

Julia Sass Rubin, New Jersey Policy Perspective, *Does the County Line Matter? An Analysis of New Jersey's 2020 Primary Election Results* (Aug. 2020) .......................................................................................................14

## INTERESTS OF AMICUS CURIAE

The Middlesex County Democratic Organization (MCDO) represents a diverse and progressive organization governed by the elected Democratic County Committee Members who are accountable to the registered Democratic voters in the 25 towns across Middlesex County.[1]  The MCDO's mission is to support local municipal campaigns, and elect strong candidates at the local, county, State, and federal level through voter education, voter registration, and coordinated Get Out the Vote efforts and initiatives year-round.

In furtherance of these missions, the MCDO endorses primary-election candidates who align with its values.  Once it has chosen a slate of candidates for the open offices in an upcoming election, the MCDO, along with its endorsed candidates, requests that the candidates' names be bracketed together on the ballot, as New Jersey allows.  Through bracketing on the "county line," the MCDO can easily identify to its members and others the candidates that the Organization has endorsed.  The District Court's preliminary injunction undermines the MCDO's efforts to have its endorsed primary candidates elected, and the MCDO has a

---

[1] No party's counsel authored this brief in whole or in part.  In addition, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no one other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.  Fed. R. App. P. 29(a)(4)(E).  All parties have consented to the brief's filing.

significant interest in this case not represented by the existing county clerk defendants.

## SUMMARY OF ARGUMENT

I.  The District Court wrongly held that New Jersey's bracketing and ballot-position laws for political primaries burden Plaintiffs' First Amendment rights. The bracketing and ballot-position laws allow Plaintiffs to have the same access to the ballot as other candidates, allow Plaintiffs to associate or not with any other candidate or political organization they wish, and allow Plaintiffs' supporters to vote for them on the same terms as any other candidate. All Plaintiffs potentially lose are the votes of low-information voters that reflexively cast their ballots for the candidate in the first ballot position.  But that loss is not a First Amendment harm; it has nothing to do with Plaintiffs' interest in associating or not associating with anyone else.

Federal appellate courts across the country have rejected similar claims, holding that any burden that candidates or parties suffer from being placed further down ballot is merely the result of a coincidental windfall vote that benefits the first-positioned candidate, not an unconstitutional restraint on associational rights. And this Court does not create splits with its sister circuits lightly, especially on weighty issues of election administration so close to the election.

Indeed, Plaintiffs' position proves too much. If ballot position based on organizational affiliation in a *primary* election violates the First Amendment, then surely ballot position based on party affiliation in the *general* election would also violate the First Amendment. But this Court has held New Jersey's system of bracketing all Republican and Democratic candidates in the same column in the general election—and randomly allocating first position between effectively the Republican and Democratic parties—violates the First Amendment, even though it naturally drives candidates to affiliate with either the Republican or Democratic parties rather than go it alone as an independent. New Jersey's bracketing and ballot-position statutes are constitutional for the primary, too.

Under the proper application of the relevant Supreme Court test, known as the *Anderson-Burdick* test, the District Court should have simply asked whether New Jersey has important interests furthered by its bracketing and ballot-position laws. It does. Bracketing and allocating ballot position in the first instance among bracketed candidates reduces voter confusion and makes voting more efficient by allowing primary voters to easily identify and quickly vote for all candidates belonging to a single political organization or affiliating with a single slogan. The District Court discounted those interests based on the idiosyncratic rejection of votes in a single county in a single primary election held almost entirely by mail

during COVID under circumstances that are unlikely to recur.  With that one incident set aside, New Jersey's justifications pass muster easily.

II.  The District Court's grant of preliminary relief was also flawed because the court ignored the interests of county political organizations and voters that support them when balancing the relative harms.  Party endorsements serve an important role in local elections.  Party organizations spend resources to recruit, vet, and support electable candidates, and endorsement allows county party organizations to signal to their members the candidates the organization believes are aligned with the organization and its supporters' values.  Endorsements' importance is amplified in low-salience elections like surrogate, county commissioner, and county clerk races where the average primary voter will not have much, if any, information about the individual candidates and their competence or position on the issues.  In those elections especially, endorsement fosters a more-informed electorate.

In New Jersey, bracketing has served as an effective means of communicating a party organization's endorsements to organization loyalists. Through the county line, party organizations can efficiently signal to their members which primary candidates have received the organization's endorsement, and organization members can efficiently vote for the endorsed candidates.  The office-block format ballot commanded by the District Court a few months before

the primary election leaves too little time for primary voters—who for decades have grown accustomed to voting on a party-line basis—to adjust their patterns. Yet the District Court wholly failed to analyze or integrate either county party organizations' interests or their voters' interests in its balancing analysis. If the District Court had done so, it would have denied the preliminary injunction.

The District Court's preliminary injunction should be reversed.

## ARGUMENT

For more than 120 years, New Jersey has affirmatively authorized and tightly regulated the manner and method of primary elections within the State. Brett M. Pugach*, The County Line: The Law and Politics of Ballot Positioning in New Jersey*, 72 Rutgers Univ. L. Rev. 629, 633-637 (2020). And for nearly that entire period, New Jersey statutes have authorized the bracketing and ballot-position practices that 19 of New Jersey's 21 counties currently employ. *Id.* During that long history, those election laws have been challenged in the New Jersey Supreme Court, as well as New Jersey's intermediate appellate and trial courts, under both state and federal law, and those challenges have gone nowhere. *See Quaremba v. Allan*, 334 A.2d 321, 326-327 (N.J. 1975) (finding no merit in constitutional challenges to New Jersey's bracketing and ballot positioning laws); *Moskowitz v. Grogan*, 243 A.2d 280, 283 (N.J. Super. Ct. App. Div. 1968) (approving New Jersey's ballot-position laws); *Gillen v. Sheil*, 416 A.2d 935, 936–

938 (N.J. Super. Ct. Law Div. 1980) (upholding the "well-established pattern of having candidates for different offices but similar view appear together on the ballot" under New Jersey law).  But with a primary election set to take place in just two months, and with ballots to be printed in the coming days, a federal trial court toppled New Jersey's bracketing and ballot-position laws by enjoining their enforcement and mandating in their place an office-block ballot format unknown to the overwhelming majority of New Jersey primary voters. That injunction not only marks a radical departure from New Jersey's settled elections practices; it's also wrong as a matter of law.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS BECAUSE PLAINTIFFS' INTEREST IN PREFERENTIAL BALLOT PLACEMENT IS NOT A FIRST AMENDMENT INTEREST THAT THE NEW JERSEY BRACKETING AND BALLOT-POSITION LAWS INJURE.

The District Court concluded that Plaintiffs were likely to succeed on the merits of their First Amendment claims because New Jersey's bracketing and ballot-position laws—which combine to create what the parties and District Court have called the "county line"—unduly burden the associational rights of candidates that would prefer to not seek the endorsement of county political organizations. *See* A34-38.   But New Jersey's ballot-design laws do not burden Plaintiffs' associational rights *at all*.  Plaintiffs may associate—or not associate—with whomever they wish and voters may vote for any qualified candidate they want to. At the very least, any minimal incidental burden on Plaintiffs' right to not associate

is outweighed by the State's interests in allowing voters to easily identify candidates that share common qualities or that are endorsed by certain political organizations.

1.  The Supreme Court has prescribed a two-step test to determine whether a state election law violates the First Amendment.  First, the Court "examine[s] whether [the challenged law] burdens rights protected by the First and Fourteenth Amendments."  *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989).  If it does, then the Court must "weigh the character and magnitude of the burden the State rule imposes on [First Amendment] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal quotation marks omitted), an inquiry known as the *Anderson-Burdick* test.  Plaintiffs' challenge fails at the first step; New Jersey's bracketing laws do not impose any burden on rights the First Amendment protects.

Under the First Amendment's right of association, "[t]he government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves."  *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012).  The government therefore may not "impair the ability of [a person] to express those views, and only those views, that [he] intends

7

to express." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  And as a consequence, the government cannot "force [a person] . . . to associate" with others that he does not wish to associate with.  *Associated Builders & Contractors W. Pa. v. Community Coll. Of Allegheny Cnty.*, 81 F.4th 279, 289 (3d Cir. 2023); *see also Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate.").

New Jersey's bracketing and ballot-position laws do not offend these principles.  N.J. Stat. Ann. § 19:23-18 and N.J. Stat. Ann. § 19:49-2 permit any group of candidates—not just those endorsed by a county party organization—to be grouped together on the primary ballot under an identical name or slogan, a grouping known as "bracketing."  The county clerk determines a "pivot point" office—the U.S. Senate or Governor when those offices are on the ballot, N.J. Stat. Ann. § 19:23-26.1—and places candidates for that office in the first column or row in an order determined by random drawing, *see id.* § 19:23-24.  Candidates bracketed with the pivot-point candidate then have their names listed on the same line or column of the ballot.  *Id.* § 19:49-2.  Because a county political organization—like the county Democratic or Republican organization—often organizes and endorses a bracketed slate of candidates that includes a pivot-point candidate, the organization's bracketed group of candidates is frequently called the "county line."  *See* A8.

Combined, these statutes mean that primary candidates for "down ballot" offices that have not bracketed with a pivot-point candidate—in this year, a U.S. Senate candidate—do not have the chance to be drawn in the first column or row on the primary ballot. Plaintiffs and their experts contend that this first position is important—and even dispositive—because some voters naturally tend to vote for candidates that appear first on the ballot. *See* A34-35.

But none of that has anything to do with the right to associate with the people or parties that the Plaintiffs choose—the associational right that the First Amendment protects. Under New Jersey's bracketing and ballot-position system, Plaintiffs can bracket with any other qualified pivot-point candidates that they desire or choose to remain unbracketed and go it alone. Plaintiffs have the same access to the ballot as every other candidate, and voters supporting Plaintiffs have the same ability to vote for Plaintiffs as they do any other candidate. Plaintiffs and their voters' associational rights are fully protected.

2. At most, if Plaintiffs do not bracket with a pivot-point candidate, they risk losing the windfall that comes from some low-information voters casting their ballots for the candidates in the first position, whomever the candidate is. But courts of appeals across the country have for decades rejected arguments that States must give every candidate equal opportunity to reap these windfall votes.

The Fourth Circuit has rejected an *Anderson-Burdick* argument almost identical to the one embraced by the District Court. *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 712, 716-721 (4th Cir. 2016) (Wilkinson, J.). Virginia allocates ballot position first by lot among parties receiving 10 percent of the vote in either of the two preceding statewide general elections, a description limited to Republicans and Democrats; then by lot among "recognized political parties," such as the Libertarian Party; and finally alphabetically among independent candidates. *Id.* at 712. The Libertarian Party and one of its candidates sued, claiming that giving preferential ballot position to the major political parties violated their First and Fourteenth Amendment rights. *Id.* at 713.

The Fourth Circuit disagreed. It explained that Virginia's ballot-position law "imposes only the most modest burdens on [the candidate]'s free speech, associational, and equal protection rights" because "[a]ll parties are subject to the same requirements" and "[w]hat is denied . . . is not ballot access, but rather access to a preferred method of ballot ordering." *Id.* at 717. That distinction was important because "mere ballot order denies neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization." *Id.* The candidate's "squabbles with his particular position on the ballot appear almost inconsequential. The ballot ordering law does not deny

anyone the ability to vote for him, nor his ability to appear on the Virginia ballot with his preferred party affiliation." *Id.* at 717-718.

The candidate argued that the ballot-ordering law severely disadvantaged him because "uninformed or undecided voters are more likely to choose candidates listed higher on the ballot." *Id.* at 718. But the Fourth Circuit explained that "access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." *Id.* at 719 (quoting *New All. Party v. New York State Bd. of Elections*, 861 F. Supp. 282, 295 (S.D.N.Y. 1994)). As a result, "[g]iven that the Virginia ballot ordering law does not restrict candidate access to the ballot or deny voters the right to vote for the candidate of their choice, or otherwise require strict scrutiny, [the court had] no need to conduct the kind of empirical analysis into burdens that would essentially displace the authority of state legislatures with the views of expert witnesses." *Id.* And the Fourth Circuit has since reaffirmed *Alcorn*, upholding West Virginia's system of giving first ballot position to the party that received the most votes at the most-recent presidential election. *Nelson v. Warner*, 12 F.4th 376, 380-381 (4th Cir. 2021). The court again explained that such ballot-positioning statutes "impose[ ] at most a 'modest' burden on" candidates' rights. *Id.* (citation omitted).

Plaintiffs' suit wilts under the Fourth Circuit's analysis. Like the Libertarian candidate in *Alcorn*, Plaintiffs are not denied the right to vote, nor the right to

appear on the ballot, nor the right to associate or not associate with any particular candidate or party. Plaintiffs instead complain that if they do not bracket with a pivot-point candidate, they are denied the opportunity to obtain the windfall vote that comes with having the first position on the ballot. *See* A32-48. But, under *Alcorn*, Plaintiffs' desire to obtain votes from voters who reflexively vote for the first-position candidate "is not a constitutional concern." 826 F.3d at 719 (citation omitted). And because Plaintiffs' desire to obtain windfall votes is not a constitutional concern, there is no more than a modest burden on any of their First Amendment rights even though the District Court credited Plaintiffs' experts regarding the existence and size of the windfall effect in New Jersey primary elections. *See* A35-36.

Once the District Court's erroneous finding of a severe burden on Plaintiffs' First Amendment rights is set aside, the constitutionality of New Jersey's bracketing and ballot-position statutes follows. If a state election statute does not impose a severe restriction on constitutional rights, the court merely examines whether "legitimate interests asserted by the State are sufficient to outweigh the limited burden." *Burdick v. Takushi*, 504 U.S. 428, 440 (1992). And when the State advances "important regulatory interests," that is "generally sufficient to justify" the modest restriction on the candidate's rights. *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

The New Jersey Supreme Court has already explained the important regulatory interests that the bracketing and ballot-position statutes serve in primaries. *Quaremba*, 334 A.2d at 326-327. Bracketing permits "a ballot so arranged that all voters may find their candidates with the least difficulty the total content of the ballot will permit" and gives "a voter who wants to advance the party or the principles of the [bracketed] candidates an easy opportunity to find all of them." *Id.* at 327 (quoting *Richardson v. Caputo*, 214 A.2d 385, 388, 390 (N.J. 1965)). And courts routinely hold that avoiding voter confusion and speeding the voting process are important government interests. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (noting the "important state interest . . . in avoiding confusion, deception, and even frustration of the democratic process"); *Alcorn*, 826 F.3d at 719-720 (noting the "important state interest of reducing voter confusion and speeding the voting process" because it "allows voters to more quickly find their preferred choice for a given office, especially when party loyalties influence many voters' decisions").

The District Court minimized New Jersey's interests by claiming that the ballot designs that county clerks use do not do a good job of furthering them, pointing to a 2020 incident in which one-third of all Mercer County Democratic Primary Election voters had their votes for the Fourth Congressional District rejected as overvotes. *See* A37. But the 2020 Mercer County Democratic Primary

vote was an anomaly.  The overvotes came about because of a quirk in the Mercer

County Democratic Organization bylaws that allowed all candidates receiving at

least 40% of the vote at the party's endorsement convention to appear on the

county line.  Julia Sass Rubin, New Jersey Policy Perspective, *Does the County*

*Line Matter? An Analysis of New Jersey's 2020 Primary Election Results* 5-6

(Aug. 2020), https://tinyurl.com/9n44fx9y.  Two candidates for the Fourth

Congressional District reached that threshold and both appeared on the county line,

leading voters used to simply selecting all candidates on the county line to

accidentally overvote their ballots.  *Id.* at 6.  Moreover, the 2020 primary elections

took place primarily by mail because of the COVID-19 pandemic, *id.* at 2, and the

paper ballots could not prevent the voter from voting for too many candidates, as

voting machines do at polling places.  This unique set of circumstances is unlikely

to recur, and the problem that led to the overvotes—that more than one candidate

appeared on the county line for a "vote one" position—is not even among the

ballot-design evils that Plaintiffs contend inflict a First Amendment injury on

unbracketed candidates.  The District Court was wrong to discount New Jersey's

important interests supporting its bracketing and ballot-position statutes.

      Beyond the Fourth Circuit, other courts of appeals have rejected ballot-

positioning challenges seeking the windfall vote under related doctrines.  Writing

before *Anderson-Burdick*'s adoption, the Seventh Circuit held that a state statute

that gave first ballot position to candidates of the two major parties did not violate the Equal Protection Clause. *Board of Election Comm'rs of Chicago v. Libertarian Party of Ill.*, 591 F.2d 22, 25-27 (7th Cir. 1979). The court of appeals explained that "the different treatment of minority parties and candidates . . . is not a barrier to a candidate's placement on the ballot and is not restrictive of voters' or candidates' rights." *Id.* at 27. Instead, "[t]he relatively slight disadvantage that may result from placement below the top two ballot positions is more than outweighed by the state's interest in assuring the quality of the election," *id.*, by "prevent[ing] voter confusion, . . . serv[ing] voter convenience, and . . . aid[ing] in the convenient tallying of results," *id.* at 25.

The Eleventh Circuit likewise rejected complaints that Florida's ballot-positioning law giving first ballot position to candidates of the incumbent Governor's party violated the First Amendment, holding that how to divide the windfall vote was a nonjusticiable political question. *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1260 (11th Cir. 2020) (W. Pryor, J.). The Eleventh Circuit declined to apply *Anderson-Burdick* because the plaintiffs' complaint about the allocation of the windfall vote "is not based on the right to vote *at all*, so [the court] cannot evaluate the[] complaint using the legal standards that apply to laws that burden the right to vote." *Id.* at 1261 (emphasis in original). And although the Eleventh Circuit rejected *Anderson-Burdick* in its entirety instead of finding the

15

First Amendment burden minimal as the Fourth Circuit did, the two courts'
reasoning is the same: A ballot-positioning law that gives the windfall vote to one
candidate as opposed to another does not "burden[] voting or associational rights
even slightly." *Id.* at 1262.  The same is true here, no matter the doctrinal
framework employed.

This Court should not lightly break from the decisions of its sister circuits,
which have consistently rejected similar claims by similar plaintiffs for decades.
The Court is "generally reluctant" to create circuit splits, and it is "doubly so when
there is a thirty-year consensus" in favor of a certain position.  *J. Supor & Son
Trucking & Rigging Co., Inc. v. Trucking Emps. of N. Jersey Welfare Fund*, 30
F.4th 179, 181-182 (3d Cir. 2022) (quoting *Parker v. Montgomery Cnty. Corr.
Facility/Bus. Office Manager*, 870 F.3d 144, 152 (3d Cir. 2017)); *see also
Guerrero-Sanchez v. Warden of N.Y. Cnty. Prison*, 905 F.3d 208, 227 (3d Cir.
2018) ("We are . . . reluctant to create a circuit split, and only do so where a
compelling basis exists.") (cleaned up).  The court of appeals' consensus in favor
of rejecting constitutional challenges to ballot-position laws seeking to claim the
windfall vote stretches back over 40 years.  The Court should not a forge a conflict
on the eve of a primary election and invalidate New Jersey statutes that have
governed the primary elections in the State for nearly a century.  *See Gonidakis v.
LaRose*, 599 F. Supp. 3d 642, 662 n.10 (S.D. Ohio 2022) (following consensus of

circuits that have addressed an issue where court did not "have the benefit of . . . time").

4.  The District Court broke from all these decisions—which it apparently did not know existed—by reasoning that the effect of windfall votes in New Jersey primary elections is so strong that candidates like Plaintiffs "suffer" for their choice not to bracket with other candidates; they must either cede the windfall votes to others or associate with candidates on the county line or in another bracket that they would prefer to not associate with for whatever reason.  *See* A35-40. That Plaintiffs must weigh the potential first-position benefits of bracketing against the burdens of being associated with others who share the same organizational label or slogan is not a First Amendment injury.  There are plenty of candidates who cringe at sharing the same label as others in their party—consider, for instance, every moderate Republican that must appear down ballot of Donald Trump.  *See* NJTV News, *Republicans Concerned About Down-Ballot Effect* (Oct. 27, 2016), https://www.pbs.org/video/njtvnews-republicans-concerned-about-down-ballot-effect/ ("Republicans in New Jersey are concerned that Donald Trump's effect on moderate Republicans voters could have a serious effect on down-ballot races in the party.")  Every politician must decide whether to associate with the party organization—with all the baggage that it entails—form his own organization, or strike out as an independent, but that is not a choice that the

Constitution has anything to say about.  It has instead been left to individual candidates for decades.

Indeed, Plaintiffs' argument proves too much.  If Plaintiffs are right that New Jersey's bracketing and ballot-position laws are unconstitutional in the primary, then New Jersey's bracketing and ballot-position laws are presumably unconstitutional in the general election, as well.  For the general election, the county clerk draws by lot to determine which "party"—which, in New Jersey, is only the Republican and Democratic parties—will occupy the first column on the ballot.  *See* N.J. Stat. Ann. § 19:14-12; *see also id.* § 19:1-1 (defining "[p]olitical party" as "a party which, at the election held for all members of the General Assembly next preceding the holding of any primary election . . . polled for members of the General Assembly at least 10% of the total vote cast in this State").  The party column functions as a bracket, grouping together in one column all Republican or Democratic candidates elected in the primary election preceding the general election.  *See id.*  The clerk then draws by lot all other candidates nominated by petition for the same office and places those candidates in a separate column.  *See id.*  A petition candidate can therefore never receive the first column except in the extraordinary circumstance where there is no Republican or Democratic nominee for the office.  And that, just like here, creates a natural pressure for a candidate to seek the Republican or Democratic nomination for the

office—and thus associate with the Republican or Democratic parties—instead of going it alone as a petition candidate.  But Plaintiffs do not contend that it violates the First Amendment for New Jersey law to assign the first ballot position to the major parties in the general election, and this Court has held it does not. *Democratic-Republican Org. of N.J. v. Guadagno*, 700 F.3d 130, 131 (3d Cir. 2012).

What is true in the general election is true in the primary election and more so.  To obtain first ballot position in the general election, a candidate must be Republican or Democratic nominee, forcing her to be bracketed with other Republican or Democratic nominees that she may not know, agree with, or may be even actively hostile towards.  To obtain first ballot position in the primary election, by contrast, a candidate must simply bracket with any other candidate for the ballot's pivot-point office; it need not be the county political organization.[2] Plaintiffs thus have *more* associational freedoms in seeking the first ballot position in a primary election than general-election candidates do.

---

[2] Plaintiffs contend that county-organization endorsed candidates obtain first ballot position in primaries more-frequently than random chance would dictate, meaning that some county clerks are "manipulating" ballot placement.  *See* A40.  But the statute is unambiguous; county clerks must select for ballot position randomly.  *See* N.J. Stat. Ann. § 19:23-24.  If Plaintiffs believe that certain clerks are rigging the drawing, their remedy is a suit under New Jersey state law to enforce the random-drawing requirement, not a First Amendment claim.

**II.    THE DISTRICT COURT DID NOT ADEQUATELY CONSIDER THE HARM TO LOCAL POLITICAL ORGANIZATIONS AND THE VOTERS THAT RELY ON POLITICAL ENDORSEMENTS WHEN BALANCING THE POTENTIAL HARMS OF GRANTING THE INJUNCTION.**

In addition to getting the likelihood of success on the merits wrong, the District Court also did not adequately consider the harm its injunction would inflict upon local political organizations that endorse candidates and—more importantly—upon the voters that rely on local political organizations' endorsements.   The District Court acknowledged that it had to consider "the possibility of harm to other interested persons from the grant or denial of the injunction."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-920 (3d Cir. 1974)).  But although the District Court spent significant time analyzing the potential harm to the parties, it totally omitted consideration of two groups whose interests are just as important in an election cycle: the local political organizations that endorse candidates and the voters themselves.  Had it done so, the District Court would have found that their "considerable" and "irreparable" injuries "cancel[ed]" out any supposed harm to the Plaintiffs.  *Delaware River Port Auth.*, 501 F.2d at 924.

Political endorsements provide a unique value to voters.  The "candidate-selection process [is] the basic function of a political party."  *California Democratic Party v. Jones*, 530 U.S. 567, 582 (2000) (internal citations omitted).

Local and national political organizations pool resources to recruit, endorse, and support electable candidates.  In turn, many voters become active in local political organizations so they can declare their allegiance to a set of political ideals and outsource candidate screening to leaders with the time to dedicate to the process and the expertise to find strong candidates.  The organization's endorsed and bracketed slate of candidates tells party loyalists which candidates their leaders believe are best for the job and share their values.  Monika L. McDermott, *Not for Members Only: Group Endorsements as Electoral Information Cues*, 59 Pol. Rsch. Q. 249, 249 (2006) (endorsements from "[p]olitically relevant groups help voters orient themselves and others in the political realm through their affiliations and actions—providing valuable cues to those who share or oppose their interests").

Party organization endorsements may mean less to Plaintiffs, who are candidates for the U.S. Senate and House of Representatives. Those races are more-widely covered and voters are relatively better informed about the candidates, their backgrounds, and positions.  But party endorsements can be invaluable in lower-salience races with lower-information voters.  Only political junkies learn enough about each primary candidate to make an informed choice about who should be their party's nominee for Surrogate, township council, or County Clerk.  Other party members "frequently lack either the means or the motivation to inform themselves fully in all elections in which they choose to

participate [and] must often make decisions between candidates about whom they have little, if any, concrete ideological or issue information." *Id.* Endorsements provide a valuable shortcut that "help[s] voters make informed decisions, even when they do not have all the information." Andrea Benjamin & Alexis Miller, *Picking Winners: How Political Organizations Influence Local Elections*, 55 Urb. Aff. Rev. 643, 644 (2017). When key interest groups make endorsements on local issues and elections, studies show that "voters behave[] in highly rational and sophisticated ways," which is "especially remarkable, given the low levels of overall knowledge that citizens report about local government affairs in general." Elisabeth R. Gerber & Justin H. Phillips, *Development Ballot Measures, Interest Group Endorsement, and the Political Geography of Growth Preferences*, 47 Am. J. of Pol. Sci. 625, 627 (2003).

Political organization endorsement—and, by extension, bracketing on the county line—allow for loyal party members with less time to dedicate to the primary process to know who aligns with their political values in a partisan primary election. Yet the District Court devoted only three lines of cursory analysis to the very group that elections laws, in large part, are meant to protect: the voters. *See* A47.

Local political organizations likewise have weighty interests in ensuring that their painstaking work in vetting and endorsing candidates is communicated to

party-organization members.  The Supreme Court has recognized that partisan political organizations are entitled to "identify the people who constitute the association and to select a standard bearer who best represents the party's ideologies and preferences."  *Eu*, 489 U.S. at 224 (citing *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986)).  In New Jersey, bracketing has served as a way of informing party-organization adherents in a partisan primary vote who the party organization-endorsed candidates are.  The District Court's failure to acknowledge the interests of local political organizations inappropriately tipped the balance of the equities in favor of an injunction.

The District Court feared that, without an injunction requiring an office-block-format ballot, unbracketed candidates would be relegated to "ballot Siberia" or to columns where they will go unnoticed or be associated with candidates with whom they disagree.  *See* A40-41.  But the District Court ignored the other side of the equation: With the county line eliminated, candidates who *are* endorsed by a local political organization will be overlooked by voters who want endorsed candidates.  The New Jersey Supreme Court highlighted this concern nearly 50 years ago, explaining that without bracketing, a voter "might have to follow a number of lines or columns to search out the candidates of his party, and this could be a considerable feat for a voter in the booth conscious of a queue on the other

side of the curtain." *Quaremba*, 334 A.2d at 327 (quoting *Richardson*, 214 A.2d at 390).

The District Court discounted this argument because office-block ballots are widely used across the country evidently without causing voter confusion. *See* A46-47. But even if office-block ballots are used nationally, they have not been used in the vast majority of New Jersey counties for the last 70 years. *See* A6-8, 18, 20. For primary voters used to voting for the county line or other bracketed groups of candidates, a sudden shift to office-block ballots just two months before the primary is a recipe for confusion. And a State is well within its fundamental powers to eliminate voter confusion more than other States have.

Even crediting the District Court's findings of harm to Plaintiffs, then, the harm simply cuts both ways. The District Court's radical redesign of New Jersey's Democratic primary ballots to supposedly prevent harm to Plaintiffs inflicts deep harm on other candidates that previously benefitted from bracketing under the county line. "Relief saving one claimant from irreparable injury" doesn't warrant a preliminary injunction if it comes "at the expense of similar harm caused [to] another." *Delaware River Port Auth.*, 501 F.2d at 924. The District Court should have given meaningful consideration to effect of the injunction on the interests of voters and local political organizations in the context of a political primary "at which the appeal to common principles may be translated into concerted action,

and hence to political power in the community." *Eu,* 489 U.S. at 224 (citation and internal quotation marks omitted). When this Court does, it should reverse the District Court's injunction.

## CONCLUSION

For the foregoing reasons, the District Court's preliminary injunction should be reversed.

Respectfully submitted,

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
SEAN MAROTTA
ERIC S. ROYTMAN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Middlesex County Democratic Organization*

April 6, 2024

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Neal Kumar Katyal, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

<div style="margin-left: 40%">

/s/ Neal Kumar Katyal
Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

</div>

April 6, 2024

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29 and Local R. 31.1, I certify the following:

1. This brief complies with Rule 29 because it contains 5,717 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Malwarebytes Anti-Malware was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ Neal Kumar Katyal
Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

April 6, 2024

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on April 6, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

<u>/s/ Neal Kumar Katyal</u>
Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

April 6, 2024