**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1594
_____

ANDY KIM, in his personal capacity as a candidate
for U.S. Senate;
ANDY KIM FOR NEW JERSEY;
SARAH SCHOENGOOD;
SARAH FOR NEW JERSEY; CAROLYN RUSH;
CAROLYN RUSH FOR CONGRESS

v.

CHRISTINE GIORDANO HANLON, in her official capacity
as Monmouth County Clerk;
SCOTT M. COLABELLA, in his official capacity as Ocean
County Clerk;
PAULA SOLLAMI COVELLO, in her official capacity as
Mercer County Clerk;
MARY H. MELFI, in her capacity as Hunterdon County
Clerk;
STEVE PETER, in his official capacity as Somerset County
Clerk;
HOLLY MACKEY, in her official capacity as Warren
County Clerk;
NANCY J. PINKIN, in her official capacity as Middlesex
County Clerk;

JOSEPH J. GIRALO, in his official capacity as Atlantic
County Clerk;
JOHN S. HOGAN, in his official capacity as Bergen County
Clerk;
JOANNE SCHWARTZ, in her official capacity as Burlington
County Clerk;
JOSEPH RIPA, in his official capacity as Camden County
Clerk;
RITA ROTHBERG, in her official capacity as Cape May
County Clerk;
CELESTE M. RILEY, in her official capacity as Cumberland
County Clerk;
CHRISTOPHER J. DURKIN, in his official capacity as
Essex County Clerk;
JAMES N. HOGAN, in his official capacity as Gloucester
County Clerk;
E. JUNIOR MALDONADO, in his official capacity as
Hudson County Clerk;
ANN GROSSI, in her official capacity as Morris County
Clerk;
DANIELLE IRELAND-IMHOF, in her official capacity as
Passaic County Clerk;
JOANNE RAJOPPI, in her official capacity as Union County
Clerk;
DALE CROSS, in his official capacity as Salem County
Clerk;
JEFF PARROTT, in his official capacity as Sussex County
Clerk;
NEW JERSEY SECRETARY OF STATE;
CAMDEN COUNTY DEMOCRATIC COMMITTEE

Camden County Democratic Committee,
                              Appellant

_____

On Appeal from the United States District Court
For the District of New Jersey
(D.N.J. No. 3-24-cv-01098)
District Judge:  Honorable Zahid N. Quraishi

_____

Argued
April 12, 2024

Before:   JORDAN, KRAUSE, and FREEMAN, *Circuit Judges*

(Filed: April 17, 2024)

_____

Alyssa Lott
William M. Tambussi   [**ARGUED**]
Brown & Connery
360 N. Haddon Avenue
P.O. Box 539
Westmont, NJ   08108
    *Counsel for Camden County Democratic Committee*

Yael Bromberg
Bromberg Law
43 W. 43rd Street – Suite 32
New York, NY  10036

Flavio L. Komuves
Bret M. Pugach   [**ARGUED**]
Weissman & Mintz
220 Davidson Avenue – Suite 410
Somerset, NJ   08873
    *Counsel for Andy Kim, Andy Kim for New Jersey,*
    *Sarah Schoengood, Sarah For New Jersey,*
    *Carolyn Rush, and Carolyn Rush For Congress*

Matthew Tavares
Rainone Coughlin Minchello
555 U.S. Highway One South
Suite 440
Iselin, NJ   08830
    *Counsel for Paula Sollami Covello*

Jennifer Borek
Daniel A. Lebersfeld
Genova Burns
494 Broad Street
Newark, NJ   07102
    *Counsel for Christopher J. Durkin, and Joanne Rajoppi*

Neal K. Katyal
Sean M. Marotta   [**ARGUED**]
Eric S. Roytman
Hogan Lovells US
555 Thirteenth Street NW
Columbia Square
Washington, DC  20004
    *Counsel for Amicus Curiae, Middlesex County*
    *Democratic Organization*

Matthew C. Moench   [**ARGUED**]
King Moench & Collins
51 Gibralter Drive
Suite 2F
Morris Plains, NJ   07950

Oliver D. Roberts
Jason B. Torchinsky
Holtzman Vogel Baran Torchinsky & Josefiak
2300 N Street NW – Suite 643-A
Washington, DC   20037
    *Counsel for Amicus Curiae, Laura Ali,*
    *New Jersey Republican Chairs Association,*
    *Morris County Republican Committee, and*
    *Jose Arango*

Scott D. Salmon
Jardim Meisner & Susser
30B Vreeland Road – Suite 100
Florham Park, NJ   07932
    *Counsel for Amicus Fulop for Governor*

Ronald K. Chen
Rutgers University
Constitutional Litigation Clinic
123 Washington Street
Newark, NJ  07102
    *Counsel for Amicus Election Law Clinic*
    *At Harvard Law School*

Nuzhat J. Chowdhury
Ryan P. Haygood   [**ARGUED**]
Henal Patel
New Jersey Institute for Social Justice
60 Park Place – Suite 511
Newark, NJ   07102

Micauri Vargas
Apartment 4
108 Pine Street
Montclair, NJ   07042
    *Counsel for Amici League of Women
    Voters of New Jersey, Salvation and Social
    Justice, New Jersey Alliance for Immigrant
    Justice, New Jersey Policy Perspective,
    AAPI New Jersey, Asian American Legal
    Defense and Education Fund, Asian American
    Advancing Justice AAJC*

Angelo A. Stio, III
Troutman Pepper
301 Carnegie Center – Suite 400
Princeton, NJ   08543
    *Counsel for Amici Joe Cohn, Staci Berger,
    James Solomon, Valerie Vainerihuttle*

Jeanne LoCicero
Liza F. Weisberg
American Civil Liberties Union of New Jersey
P.O. Box 32159
Newark, NJ  07102
> *Counsel for Amicus American Civil*
> *Liberties Union of New Jersey*

––––––––––––––––

OPINION OF THE COURT

––––––––––––––––

**JORDAN**, *Circuit Judge*.

This is an appeal from a preliminary injunction directed at county clerks in New Jersey, the people responsible for choosing the form of election ballots in that state.  Securing a local political party's endorsement is important in every primary election, but it is nowhere more important than in New Jersey, where endorsements and ballot placement on the so-called "county line" have significant electoral value.  Voters must navigate complex and sometimes contradictory ballots in order to vote for candidates who are left off the county line.  This structure of preferential treatment – with candidates chosen by local party leaders eligible for prime ballot placement by county clerks – favors the Democratic and Republican political parties and their leaders, which suggests why this appeal continues even after the county-clerk defendants have all withdrawn.  The sole remaining appellant, the intervenor-defendant Camden County Democratic Committee (the "CCDC" or the "Committee"), is fighting to maintain the county-line-style ballots, but we are persuaded that the District Court's thorough and carefully reasoned

opinion reflects no abuse of discretion, so we will affirm the preliminary injunction.

## I.    BACKGROUND

New Jersey's primary election ballots are unique. Every state in the Union, except for New Jersey, uses what is called an "office-block" design for their ballots. That design groups candidates by the offices for which they are running. But New Jersey, in nineteen of its twenty-one counties,[1] groups candidates together in columns (or rows) based on the "slogan" they choose. Candidates who choose the same slogan, and thus opt to be "bracketed" together, will appear in the same column (or row). N.J. Stat. Ann. §§ 19:23-6, 19:49-2. Certain slogans are reserved and require approval to adopt – as relevant here, the slogan of the county party. *Id.* § 19:23-17. In practice, the county party allows only those candidates it has endorsed to adopt its slogan. Once candidates have chosen their slogans, they are placed in columns (or rows) from left to right (or top to bottom) alongside those in their bracket. Preferential column (or row) placement is given to bracket groups containing "pivot candidates," those candidates who are running for a specific office.[2] Those candidates who have adopted the county party's slogan typically appear in a full (or almost-full) slate of candidates known as the "county line," and because that bracket group usually contains a pivot candidate,

---

[1] Salem County and Sussex County currently use the office-block design for their primary election ballots.

[2] In 2024, pivot candidates are those running for a U.S. Senate seat. *See* N.J. Stat. Ann. § 19:23-26.1.

it is almost always eligible for a coveted position on the left (or top) of the ballot.

Even apart from its placement, the county line itself carries weight, as it visually signals to voters the candidates whom the county's political leadership favors and typically includes "incumbents, other highly-recognizable names, and 'party elites[.]'"  (App. at 68.)  Non-pivot candidates who do not obtain a spot on the county line and choose not to be bracketed with a pivot candidate are often placed in more obscure parts of the ballot to the right (or bottom) of the county line, colloquially referred to as "Ballot Siberia."  (App. at 41.)  Those unfavored candidates may also be stacked with their opponents or with other candidates with whom they do not wish to be associated, which to a voter would be indistinguishable from bracketing.

The following are examples of, first, a county-line ballot (D.I. 1-1 at 64), and, second, an office-block ballot (D.I. 1-1 at 61):

| SUSSEX COUNTY | NEW JERSEY | JULY 7, 2020 |

**INSTRUCTIONS TO THE VOTER:**

1. To vote for any candidate whose name is printed on this ballot, fill in the oval to the left of the candidate's name (from this ⬤ to this ⬤). Do not vote for more than the number of candidates to be elected to each office.

2. USE ONLY BLACK OR BLUE BALLPOINT PEN OR A #2 PENCIL TO MARK YOUR BALLOT.

3. To vote for a person whose name is NOT printed on this ballot, write the person's name on the blank line(s) below the proper title of office (marked "WRITE IN") AND fill in the oval to the left of the name (from this ⬤ to this ⬤).

**NOTE:** Failure to fill in the oval after writing in a name will void this vote.

4. Do not mark this ballot in any manner other than provided for and **do not erase.** If you spoil your ballot, return it to the County Clerk, who will provide you with a fresh ballot. If you mark your ballot in such a way that your intent is unclear, or if you vote for more than the number to be elected to an office, your vote for that office **WILL NOT BE COUNTED.**

**TO PROTECT YOUR VOTE:** IT IS AGAINST THE LAW FOR ANYONE EXCEPT YOU, THE VOTER, TO MARK OR INSPECT THIS BALLOT. However, a family member may assist you in doing so. If you are an incapacitated absentee voter, a person other than a family member may also assist you in doing so.

## FEDERAL

### PRESIDENT/DELEGATES
(Vote for One)

⬭ **Bernie Sanders**
*Bernie 2020. Not Me. Us.*
11th District Delegates:
Patricia Campos Medina, Mary Gerhold, Aaron Hyndman

⬭ **Joseph R. Biden**
*Sussex County Democratic Organization*
11th District Delegates:
Linda Telschow, Thomas Regrut, Kendall Lopaz

⬭ **11th District Delegates:**
Christine Chen, Janice J. Miller

⬭ _____
Write In

### U.S. SENATE
Six-Year Term (Vote for One)

⬭ **Lawrence Hamm**
*Not Me. Us.*

⬭ **Cory Booker**
*Sussex County Democratic Committee Organization*

⬭ _____
Write In

### HOUSE OF REPRESENTATIVES
11th CONGRESSIONAL DISTRICT
Two-Year Term (Vote for One)

⬭ **Mikie Sherrill**
*Sussex County Democratic Committee Organization*

⬭ _____
Write In

## COUNTY

### FREEHOLDER
Three-Year Term (Vote for One)

**No Petition Filed**

⬭ _____
Write In

## MUNICIPAL

### FAULKNER ACT

**No Municipal Offices Voted This Primary Election**

| SPARTA TOWNSHIP 1 |

Primary elections will be held in New Jersey on June 4, 2024. Congressman Andy Kim, who is running for a seat in the U.S. Senate, and Sarah Schoengood and Carolyn Rush, who are both running to represent their respective districts in the U.S. House of Representatives (collectively, the "Plaintiffs") – all three of whom are Democrats – filed a verified complaint in the District Court against clerks whose counties use the county-line format for ballots. They allege that the design is unconstitutional under the First Amendment. Specifically, they allege that the county-line ballot design infringes their Right to Vote, Right to Equal Protection, and Freedom of Association. They also allege that the design violates the Elections Clause of the Constitution. Their allegations implicate several New Jersey statutes, in particular N.J. Stat. Ann. §§ 19:23-18 (permitting candidates to be grouped, or bracketed, together on primary election ballots), 19:23-24 (authorizing county clerks to conduct a drawing to determine the order of office positions on the ballot), 19:23-26.1 (requiring that U.S. Senatorial and gubernatorial races receive the first and second ballot positions, when applicable), and 19:49-2 (requiring grouped candidates to be drawn for ballot position as a unit).

On the same day that they filed this suit, February 26, 2024, the Plaintiffs also filed a motion for a preliminary injunction forbidding the county clerks from using county-line ballots and instead requiring them to use ballots with an office-block format. The Plaintiffs served their verified complaint and motion for preliminary injunction on all New Jersey county clerks, the New Jersey Secretary of State, the New Jersey Attorney General, the New Jersey Democratic and Republican State Committees, and several Democratic and Republican county political parties, including the CCDC. The

CCDC filed a motion to intervene, which the District Court granted.

Three days after the Plaintiffs filed their verified complaint, the District Court conducted a case management teleconference, established a briefing schedule, and set an evidentiary hearing for March 18, 2024. The day before the evidentiary hearing, New Jersey's Attorney General advised the District Court in a letter with detailed legal analysis that he would not seek to intervene in the case because he had "concluded that the challenged statutes are unconstitutional[.]" (D.I. 149 at 1.)

The next day, as scheduled, the District Court conducted a nearly nine-hour "marathon" evidentiary hearing, during which seven witnesses testified. (App. at 26.) Eleven days later, the Court granted the Plaintiffs' motion for a preliminary injunction, accompanying its order with a 49-page opinion, meticulously citing the testimony and other evidence that had been adduced. Summing up what was at issue, the Court said, "[The] Plaintiffs assert that their right to associate (and not associate) with other candidates is burdened by the bracketing system" because they may not want to associate with certain other candidates due to "differences in policy, … personal views, line-mates who are supporting a competing candidate, and not even knowing the other line members." (App. at 34.) The Court also emphasized the Plaintiffs' assertions that the bracketing structure gave an unfair and unconstitutional advantage to candidates favored by party leaders.

The District Court explained that the Plaintiffs had "support[ed] their application with a substantive factual record,

including expert reports and credible expert and factual testimony." (App. at 38.) Specifically, the Court pointed to reports from Dr. Josh Pasek and Dr. Julia Sass Rubin. Dr. Pasek "review[ed] and summarize[d] more than four dozen studies" to conclude that "there is a pervasive primacy effect that favors candidates in elections that appear in an early position on a ballot." (App. at 35.) His report also described the effect on voting that the county-line ballot format generates, an effect he called the "weight of the line." (App. at 35.) The Court explained that Dr. Pasek opined that voters select U.S. House and Senate candidates "11.6% more frequently when the endorsed candidates appeared together on a county line than if they appeared separately in office-block format[,]" and that Dr. Rubin similarly concluded that there was a 12% mean benefit for candidates who were placed on the county line, compared to those who were off the line. (App. at 35-36.)

According to the District Court, the expert reports and testimony were "well-reasoned" and showed that ballot placement on the county line provided a substantial benefit that went beyond mere local party endorsement. (App. at 36.) In addition, the Court found that "candidates placed in an early position on a ballot receive a distinct advantage." (App. at 35.) For those reasons, the Court concluded that the Plaintiffs had shown a severe burden on their First Amendment rights.

It also concluded that the county clerks' expression of the State's interests – namely preserving a candidate's right to associate, to communicate those associations to voters, to provide an understandable ballot, and to prevent voter confusion – was "not especially compelling." (App. at 37.) In the Court's view, the record evidence did not support the idea

that those interests were threatened by an injunction, nor did those interests outweigh the burdens imposed by the county-line format.  In fact, the Court explained, county-line ballots can confuse voters.  It cited the example of a county ballot that caused almost one-third of voters in a 2020 Democratic primary election to have their votes invalidated because they voted for more than one candidate for the same elected position.[3]

The District Court also decided that, in the absence of an injunction, the Plaintiffs' First Amendment harms would be irreparable.  If the Plaintiffs exercise their constitutional right to not associate with other candidates on the county line, "they will be punished for doing so by being excluded from the preferential ballot draw and risk getting relegated to obscure portions of the ballot in Ballot Siberia[.]"  (App. at 40 (internal quotation marks omitted).)    "Alternatively, Plaintiffs are 'forced' to associate with candidates with whom they may not want to associate and whose policies they may disagree with."  (App. at 40 (internal quotation marks omitted).)  Even with

---

[3] At oral argument, the CCDC responded that the 2020 Democratic primary election was an anomaly because voters were forced to use paper ballots that year instead of machines that would not have allowed them to vote for multiple candidates running for the same office.  But that only underscores the District Court's point.  In the only year when voters could have mistakenly voted for multiple candidates for the same office (because voting machines were not used and, accordingly, overvoting was not prevented), nearly one-third of one county's voters did so.  That strongly suggests that the bracketing system is confusing to voters.

respect to Senate-candidate Kim, who will be on the county line in most counties, the Court explained that, without an injunction, there will be a forced association with other candidates on the county line who do not support him.

Balancing the harms, the District Court determined that the Plaintiffs' irreparable harm would exceed any burden on the State. The county clerks argued that changing the ballot design this soon before an upcoming primary election could not be done and that it would cause "chaos[.]" (App. at 47.) Considering all of the evidence, the Court disagreed and found instead that voting machines used in New Jersey can readily accommodate office-block ballots and that changing a ballot's layout would take a day at most. One of the defendants' own witnesses, a vendor who prints ballots, testified at the hearing that if the clerks asked him to change the ballots to the office-block style for the upcoming primary election, he would "[o]ne hundred percent" find a way to get it done. (App. at 49.) The Court also determined that the public interest favored protecting the Plaintiffs' constitutional rights.

Having thus determined that the required elements for immediate equitable relief were satisfied, the Court granted the preliminary injunction.[4] That same day, the county clerks and

---

[4] In addition, the District Court concluded that the Elections Clause was an independent basis to grant the injunction, reasoning that the county-line ballot structure exceeds a state's right to regulate the time, place, and manner of an election. We discuss this point further herein. (*Infra* at § II.B.1.b).) The Court also resolved seven motions in limine and the county clerks' arguments that the case should be dismissed for Plaintiffs' lack of standing and for failure to join

the CCDC filed an emergency motion to stay the injunction and a notice of interlocutory appeal. The Morris County Republican Committee (the "MCRC") requested confirmation that the District Court's Order applies only to the Democratic primary and not the Republican primary. In response, the Court clarified that the injunction does not apply to the Republican primary. The motion to stay was denied on April 1, 2024.

The county clerks and the CCDC then immediately filed a motion to stay in our Court. We too denied a stay. Subsequently, the county clerks moved to withdraw from the appeal, pursuant to Federal Rule of Appellate Procedure 42(b). The Plaintiffs consented, and we dismissed the clerks' appeals with prejudice. Accordingly, the CCDC is the only remaining appellant.[5]

---

required parties, all in favor of Plaintiffs. The CCDC does not raise those issues on appeal.

[5] The Middlesex County Democratic Organization filed an amicus brief in favor of the CCDC, as did the MCRC, et al. The following appeared as amici in support of the Plaintiffs: Steven Fulop's gubernatorial campaign, Fulop for Governor; the Election Law Clinic at Harvard Law School; the League of Women Voters of New Jersey, Salvation and Social Justice, New Jersey Alliance for Immigrant Justice, New Jersey Policy Perspective, AAPI New Jersey, Asian American Legal Defense and Education Fund, Asian Americans Advancing Justice | AAJC; the ACLU of New Jersey; and New Jersey Democratic candidates Joe Cohn, Staci Berger, James Solomon, Valerie Vainieri Huttle.

## II.　DISCUSSION[6]

The mandatory injunction entered by the District Court compels New Jersey county clerks to use an office-block design for Democratic ballots in the June 4, 2024, primary election. The CCDC, not the clerks, now challenges that injunction, arguing it violates the Committee's First Amendment associational rights. Before reviewing the merits of the injunction, we first consider whether the issues are justiciable and whether the CCDC has standing to assert interests belonging to the State of New Jersey.

### A.　Justiciability

#### 1.　The Political Question Doctrine Is Inapplicable.

No party here or below raised the issue of justiciability of these claims and whether the political question doctrine precludes them. One of the amici, however, the MCRC, argues that the Plaintiffs are asking us to "use [our] own political judgment to alter well-established New Jersey balloting processes[,]" which it says is foreclosed by the political question doctrine. (MCRC Amicus Br. at 12.) "Although an

---

[6] The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). "We employ a tripartite standard of review for … preliminary injunctions. We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251, 256 n.5 (3d Cir. 2020).

*amicus* brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal," and, if only raised by amici, such issues are normally not considered on appeal. *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 383 n.2 (3d Cir. 2012). This political question argument, however, implicates our subject matter jurisdiction and so cannot be waived or forfeited. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). We therefore address it.

In *Rucho v. Common Cause*, the Supreme Court instructed that "[f]ederal courts can address only questions 'historically viewed as capable of resolution through the judicial process.'" 139 S. Ct. 2484, 2493-94 (2019) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). That means "[s]ometimes, … 'the judicial department has no business entertaining the claim of unlawfulness – because the question is entrusted to one of the political branches or involves no judicially enforceable rights.' In such a case the claim is said to present a 'political question' and to be nonjusticiable[.]" *Id.* at 2494 (first quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion); and then quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). The test is whether the claim is "of [a] *legal* right, resolvable according to *legal* principles, or [a] political question[] that must find [its] resolution elsewhere." *Id.* at 2494, 2496 (emphasis in original) (holding that questions of partisan gerrymandering are entrusted to the political branches, not courts, and that such claims lack "judicially discoverable and manageable standards" for court resolution). In this case, the constitutional questions can be resolved by resorting to settled First Amendment legal principles.

Courts often decide ballot-design cases, almost universally agreeing that such cases pose judicial questions that can be resolved through application of judicially manageable standards, such as the standards laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992) (hereinafter, the "*Anderson-Burdick* framework").[7]    The political question doctrine is therefore inapplicable here and the issues presented are justiciable.

---

[7] *See, e.g.*, *Pavek v. Simon*, 967 F.3d 905, 907 (8th Cir. 2020) (rejecting justiciability concerns and concluding, "We have adjudicated the merits of such claims before and have comfortably employed judicially manageable standards in doing so"); *Nelson v. Warner*, 12 F.4th 376, 386-87 (4th Cir. 2021) ("[T]he political question doctrine does not bar [the court] from considering the plaintiffs' ballot-order challenges. … Nor does *Rucho* [*v. Common Cause*, 139 S. Ct. 2484 (2021),] call into question use of the *Anderson/Burdick* framework[,]" as it applies only to partisan gerrymandering); *Mecinas v. Hobbs*, 30 F.4th 890, 901-02 (9th Cir. 2022) (same and collecting cases); *but cf. Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1260 (11th Cir. 2020) (holding that complaints of *partisan* advantage from ballot order presents a nonjusticiable question following *Rucho*).  The Supreme Court has also summarily affirmed a three-judge district court panel enjoining use of an incumbent-weighted ballot, despite there being an objection based on the political question doctrine.  *Powell v. Mann*, 398 U.S. 955 (1970), *aff'g*, 314 F. Supp. 677 (N.D. Ill. 1969).

2.    The CCDC is Not Asserting the State's Interests as Its Own, But Vindicating Its Own Rights.

The Plaintiffs argue that the CCDC, as an intervenor, "cannot stand in the shoes of state actors, to assert state and government interests." (Reply Br. at 48.)  A party "generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (limiting third-party standing to parties with a "close" relationship and when there is a "hindrance" to the right-possessor's "ability to protect his own interests").  But in bringing this appeal, the CCDC does not simply rely on harms to New Jersey; it frankly asserts that it has "different interests" than the county clerks. (Reply Br. at 24.)

The CCDC instead is appealing to address alleged infringements of its own constitutional rights that result from the District Court's injunction, including what it claims are "the right to not only endorse and identify candidates that share [political parties'] ideologies and preferences, but [also] to group the candidates in a manner that informs voters of the individuals who constitute the association to advance their shared interests[.]"  (Opening Br. at 19.)  Accordingly, the CCDC is not simply relying on the State's interests to gain relief.[8]

---

[8] The CCDC's appeal is thus distinguishable from cases like *Hollingsworth v. Perry*, where the Supreme Court declined to uphold "the standing of a private party [without an independent injury] to defend the constitutionality of a state

Because all of the county clerks are no longer involved in this appeal,[9] the CCDC necessarily stands alone to defend the constitutionality of the county-line ballot practice in New Jersey, and it does so in order to vindicate its own rights. Therefore, as the parties all agree, because the question presented concerns state election law, we are obligated to apply the *Anderson-Burdick* analytical framework, as directed by the Supreme Court.

## B.    The Preliminary Injunction Standard Is Met

"[A] mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts."  *Trinity Indus.,*

---

statute when state officials [had] chosen not to."  570 U.S. 693, 707-09, 715 (2013).  In contrast to *Hollingsworth*, the CCDC has alleged its own injury, and "an intervenor … ha[s] standing to appeal an adverse judgment, even if the state declines to appeal it, if the intervenor can independently demonstrate that he fulfills the requirements of Article III." *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 430 (6th Cir. 2008); *see Associated Builders & Contractors v. Perry*, 16 F.3d 688, 694 (6th Cir. 1994) (Merritt, C.J., concurring in the result) (citing a number of "famous cases [to] demonstrate that two private parties are fully entitled to litigate the constitutionality or other validity of state statutes").

[9] New Jersey's interests were initially voiced by the county clerks – all nineteen of which have withdrawn their appeal.  Additionally, as noted earlier, the New Jersey Attorney General has refused to defend the ballot-ordering statutes, as indicated in his letter declining to intervene before the District Court.

*Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013). To obtain any preliminary injunction, a plaintiff must show (1) he will likely succeed on the merits; (2) he will likely suffer irreparable injury; (3) the balance of equities favors him; and (4) the injunction serves the public interest. *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023). The first two prongs are "gateway factors," and we typically only consider "the remaining two" if "these gateway factors are met[.]" *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). And over and above the showing required to maintain the status quo, to obtain the mandatory injunctive relief sought here, a plaintiff must "show a substantial likelihood of success on the merits and that [one's] right to relief is indisputably clear[.]" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (cleaned up).

> 1. <u>The Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits.</u>

> a) <u>*First Amendment*</u>

The Plaintiffs have a substantial likelihood of success on the merits of their First Amendment claims. Because state election laws inevitably burden some fundamental rights, the Supreme Court has, in the *Anderson-Burdick* framework, "crafted a unique test for 'constitutional challenges to specific provisions of a State's election laws.'" *Mazo*, 54 F.4th at 137 (cleaned up) (quoting *Anderson*, 460 U.S. at 789). The test called for in that framework weighs the burden placed upon a plaintiff's rights against the state's interest in regulating elections. *Id.* at 145. If the burden on the plaintiff's rights is "severe," we apply strict scrutiny. *Id.* (quoting *Crawford v.*

*Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring)).  If, however, the state's regulations just impose "reasonable, nondiscriminatory restrictions" we need only determine whether the state's "legitimate interests ... are sufficient to outweigh the limited burden[.]"  *Id.* at 137 (quoting *Anderson*, 460 U.S. at 788 and then *Burdick*, 504 U.S. at 440).  "Evidence is key to the balancing of interests at the heart of the *Anderson-Burdick* framework."  *Id.* at 152.  A plaintiff must substantiate his or her alleged harm, because we will not find a state regulation unconstitutional based upon "'hypothetical' or 'imaginary' cases." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).

The District Court found that the Plaintiffs here suffer two forms of harm.  First, candidates who are running for a pivot point office but do not wish to associate with a county line, such as Senate-candidate Kim on the Camden County ballot, suffer a distinct electoral disadvantage as a result of that choice.  As alluded to earlier (*see supra* at § I), Dr. Pasek's expert report, which the District Court credited as "well-reasoned," explained that "voters selected candidates endorsed by a county 11.6% more frequently when the endorsed candidates appeared together on a county line than if they appeared separately in office-block format."  (App. at 35.)  And Dr. Rubin's report, which the Court similarly credited, added that "in 35 of the 37 primary contests that took place in New Jersey between 2012 and 2022, candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line.  The difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12% points and a median of 11 percentage points."  (App. at 36

(internal quotation marks omitted).)  Thus, candidates like Kim are forced to choose between either associating with candidates they may not wish to associate with or suffering material disadvantages in the election.

Candidates who are running for other offices, such as congressional candidates Schoengood and Rush, face a different type of harm.  To have any chance of being placed in the first column or row of the ballot, they must accept being bracketed with a candidate running for a pivot point office.  If they are unable to do that, or choose not to, they may be relegated to Ballot Siberia and perhaps even stacked in the same column as their opponents.  This too puts them at a distinct electoral disadvantage.  As Dr. Pasek explained, "primacy biases in New Jersey elections will always negatively impact candidates who do not bracket with a candidate for the pivot-point position, as these candidates are guaranteed to be placed in positions further to the right of (or below) colleagues who are bracketed with someone in the pivot-point position." (App. at 42 (cleaned up).)  Such placement matters because, according to Dr. Pasek, "all candidates on party-column ballots performed better when listed in the leftmost available position, with these benefits ranging from 3.9 percentage points to 27.8 percentage points across candidates." (App. at 42.)  The District Court found that evidence to be credible, and we discern no clear error in its findings.[10]

---

[10] At oral argument, the CCDC asserted that the District Court clearly erred in its factual findings because it did not provide the CCDC with enough time to rebut the Plaintiffs' expert findings, producing an inherently unreliable record.  We disagree.  At its core, the CCDC's argument is that the record

The question then becomes the severity of the burden upon the Plaintiffs' rights.  A burden is "severe" and "will be 'especially difficult for the State to justify'" where the challenged regulation "limit[s] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status[.]"  *Mazo*, 54 F.4th at 146 (quoting *Anderson*, 460 U.S. at 793).  Discrimination may thus be based on viewpoint,[11] or

---

so strongly favors the Plaintiffs because the CCDC had insufficient time to prepare, because the District Court did not grant its motion to intervene until shortly before the evidentiary hearing and then limited the preliminary injunction hearing to nine hours on a single day.  But the CCDC was served notice 20 days before the hearing, which provided it with ample time to retain its own experts or at least develop a record showing it had tried.  And the District Court's decision to limit the evidentiary hearing to nine hours is a discretionary matter (as even the CCDC acknowledged at argument), and, on review, we perceive no abuse of discretion.  We note the irony that the CCDC argues that it should have been given more time while simultaneously arguing under *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), that there was no time to lose in ruling on the Plaintiffs' application for an injunction.

[11] Discriminatory election laws can take different forms.  Because Plaintiffs claim that New Jersey's ballot display violates their First Amendment right of free association, we focus on that right here.  We note, however, that amicus, the American Civil Liberties Union of New Jersey, argues that "[c]ounty clerks in New Jersey, through non-neutral primary ballot design procedures, unconstitutionally engage in viewpoint-based discrimination."  (ACLU Amicus Br. at 12.)

on "restrictions [that] operate as a mechanism to exclude certain classes of candidates from the electoral process." *Id.* In the latter case, the key "inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity.'" *Id.* (quoting *Anderson*, 460 U.S. at 793). "[B]urdens that apply to all voters, parties, or candidates are less likely to be severe[,]" *id.* at 146, and "burdens are not severe if they are ordinary and widespread[,]" *id.* at 152 (internal quotation marks and citations omitted). Severe burdens are lessened if the state "provide[s] alternative methods for the exercise of burdened rights." *Id.* at 151.

The county-line system discriminates based upon the candidates' associational choices and policy positions. Again, according to factual findings by the District Court, that system forces candidates to choose between associating with candidates with whom they may not wish to associate or facing "Ballot Siberia." It favors candidates whose views most align with the party bosses'. *See id.* at 147 n.39 (a ballot practice is severe if it "favor[s] certain candidates or outcomes"). That, coupled with record evidence that bracketing and primacy significantly impact election results, makes the burden on plaintiffs' rights severe.[12] While candidates are not completely

---

Viewed in that light, the bracketing and ballot placement system would also clearly be constitutionally problematic.

[12] Some New Jersey state cases have upheld the county-line ballot system. *See Schundler v. Donovan*, 872 A.2d 1092, 1100 (N.J. App. Div.) (generally upholding the constitutionality of the bracketing system), *aff'd,* 874 A.2d 506 (N.J. 2005); *Quaremba v. Allan*, 334 A.2d 321, 330 (N.J. 1975) (upholding New Jersey laws underlying the county line

excluded from the ballot and so can garner votes, the discriminatory nature of the county-line system requires that the state legislation satisfy heightened scrutiny.

To be sure, a ballot-placement scheme that utilizes a lottery or applies to all parties equally will likely not, by itself, place a severe burden upon candidates. *See, e.g.*, *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) (upholding ballot law that was "facially neutral and nondiscriminatory"); *Democratic-Republican Org. of New Jersey v. Guadagno*, 900 F. Supp. 2d 447, 456 (D.N.J.), *aff'd*,

---

system).    But we owe no deference to a state court's interpretation of the United States Constitution. *United States v. Bedford*, 519 F.2d 650, 654 n.3 (3d Cir. 1975) ("It is a recognized principle that a federal court is not bound by a state court's interpretation of federal laws or of a state statute under misapprehension of federal law.").  And it is not insignificant that the New Jersey Attorney General has opted in this case to forego any defense of the statutes allowing the county-line ballots.  Indeed, his letter to the District Court constitutes a ringing condemnation of those statutes, given the factual record presented here.  (*See* D.I. 149 at 1 (declining to intervene in the case because "[i]n light of the evidentiary record, … the challenged statutes are unconstitutional[.]"); *id.* at 2 (explaining that he "has not identified reliable empirical evidence countering this [case's] record evidence" and that he lacks "a basis for intervening to defend [the statutes'] constitutionality"); *id.* at 4 ("This is an exceptional case, justifying the Attorney General's exceptionally rare decision not to defend the constitutionality of the challenged statutes.").)

700 F.3d 130 (3d Cir. 2012) (upholding an election law that "imposes only a minimal nondiscriminatory burden on minor parties"). But the record before us supports the District Court's ruling. It shows that the county-line system is discriminatory – it picks winners and punishes those who are not endorsed or, because of their political views, want to disassociate from certain endorsed candidates. Those disfavored candidates are put in undesirable ballot positions and, by random coupling, can end up paired with potentially objectionable candidates. Those outcomes amount to a severe burden on the Plaintiffs' rights.

The CCDC argues that a regulation that is merely about ballot placement, rather than ballot access, does not impose a severe burden. But we don't just ask whether a candidate's name physically appears on the ballot. "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity.'" *Mazo*, 54 F.4th at 146 (quoting *Anderson*, 460 U.S. at 793).

The CCDC contends that the "primacy" effect is a wash because first position on the ballot is randomly assigned, and pivot-point candidates may obtain the coveted first spot even if they do not obtain the county-line endorsement. (Opening Br. at 26.) That, however, is only true of candidates for the U.S. Senate or for Governor. It ignores Schoengood and Rush, running for U.S. Congress, who are excluded from the first position unless they appear on the county line or bracket with an unendorsed Senate candidate.

The state, no doubt, has protectable interests in regulating elections, and, before the District Court, the county clerks suggested four. They asserted as facts that the current

28

system (1) preserves candidates' political parties' rights to associate; (2) communicates candidates' associations to voters; (3) provides a manageable and understandable ballot; and (4) prevents voter confusion. The CCDC argues for the constitutionality of the county-line ballot framework, advancing essentially the same state interests articulated earlier by the county clerks. Even if those factual assertions were true, however,[13] the record does not demonstrate that the county line system is "narrowly tailored [to] advance [those] compelling state interest[s]." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). As outlined by the District Court, parties and candidates have plenty of other ways to express their associations, and forty-nine other states have managed to provide manageable, understandable, and unconfusing ballots, as have two counties in New Jersey. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989) (rejecting a compelling interest when the state "is virtually the only State that has determined" to conduct its elections a certain way).

The CCDC also asserts that its own First Amendment associational rights are harmed by the injunction. It argues that political organizations have "the right to not only endorse and identify candidates that share their ideologies and preferences, but to group the candidates in a manner that informs voters of the individuals who constitute the association to advance their shared interests[.]" (Opening Br. at 19.) In *Timmons*,

---

[13] There is ample reason to believe the assertions are not entirely true. For example, the District Court took evidence and concluded that the county-line ballots are not understandable and that they can cause rather than prevent voter confusion. Those findings are not clearly erroneous.

however, the Supreme Court rejected the idea that parties have a constitutional right "to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate." 520 U.S. at 363. Here, nothing in the preliminary injunction prohibits the CCDC from including county parties' slogans on the ballot, endorsing candidates, communicating those endorsements, or associating by any other constitutional means. The injunction simply means that the CCDC does not get to bracket its preferred candidates together on the ballot. "[T]he First Amendment does not give political parties a right to have their nominees designated as such on the ballot." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453 n.7 (2008). As the CCDC's First Amendment rights are not meaningfully harmed by the injunction, the burdens on the Plaintiffs' competing First Amendment rights outweigh any of them. Like the state law in *Timmons*, the preliminary injunction "do[es] not restrict the ability of the [CCDC] and its members to endorse, support, or vote for anyone they like." 520 U.S. at 363.

Based on the record developed in the District Court, there is a very substantial likelihood that the Plaintiffs will succeed on the merits of their First Amendment claims under the *Anderson-Burdick* framework. Even if that were a closer call, however, we would uphold the District Court's order. *See Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004) (holding that if a constitutional question underlying a preliminary injunction "is close … we should uphold the injunction and remand for trial on the merits").

*b)*    <u>*Elections Clause*</u>

We would also uphold the order because New Jersey's county-line ballots, as the District Court held, are invalid under the Elections Clause, U.S. Const. art. I, § 4, cl. 1. When a state election law exceeds the state's authority to regulate "[t]he Times, Places, and Manner of holding Elections" for United States Senator and House Representative, *id.*, it is unconstitutional, regardless of the burden it places upon the parties' rights. *See Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140 n.14 (3d Cir. 2022) ("Because such laws fall outside of State's constitutional authority, they do not enjoy the deference afforded by the *Anderson-Burdick* balancing test."). A state election law exceeds the state's authority to regulate the "Times, Places, and Manner" boundaries when it "dictate[s] electoral outcomes," or "favor[s] or disfavor[s] a class of candidates," especially when the "adverse [ballot practice] handicap[s] candidates 'at the most crucial stage in the election process – the instant before the vote is cast.'" *Cook v. Gralike*, 531 U.S. 510, 523, 525 (2001) (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)).

The District Court found that the county-line form of ballot appears to do just that. As it explained, it does not merely regulate "the numerous requirements … ensuring that elections are fair and honest, and that some sort of order, rather than chaos, is to accompany the democratic process"; it puts a thumb on the scale for preferred candidates, impacting elections outcomes "before the vote is cast." *Id.* at 524-25 (internal quotation marks omitted). Thus, it is likely unconstitutional. At oral argument, counsel for the CCDC acknowledged that "if we conclude that the District Court's findings are not clearly erroneous … we then have a violation

of the Elections Clause per se." (Oral Arg. 46:43-56.) That is fatal to the CCDC's appeal because, as we have explained, the District Court's factual findings are not clearly erroneous. Based on those factual findings, the Court reasonably concluded that New Jersey's bracketing and ballot placement system disfavors a class of candidates.

### 2. The Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). More so here, as the status quo deprives the Plaintiffs – especially Schoengood and Rush – of a fair chance to win the election, a harm "where monetary damages" are "inadequate." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). Finally, the Plaintiffs' rights not to associate with objectionable candidates, *see Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000), are burdened when they must choose between that and an unwelcome ballot position.

### 3. The Balance of Harms and The Public Interest Also Favor Plaintiffs.

The third and fourth injunction factors favor the Plaintiffs as well. As discussed earlier, any harm to the state's or the CCDC's interests is outweighed by the burdens on the Plaintiffs' associational rights. And any logistical burden the county clerks face in changing the ballots appears to be entirely manageable, as evidenced by the District Court's findings and the fact that all of the clerks have abandoned this appeal. Looking at the final factor of the traditional preliminary

injunction test, the answer is clear:  remedying an unconstitutional practice is always in the public interest. *Schrader*, 74 F.4th at 128.

### C.    The *Purcell* Doctrine Does Not Compel a Contrary Result

On appeal, the CCDC adopts the county clerks' argument that the District Court erred under *Purcell v. Gonzalez* because it imposed an injunction too close to an election.  "[F]ederal courts should ordinarily not alter the election rules on the eve of an election."  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), *Frank v. Walker*, 574 U.S. 929 (2014), and *Veasey* v. *Perry*, 574 U.S. 951 (2014)).  But *Purcell* is a consideration, not a prohibition, *see, e.g.*, *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay), and it is just one among other "considerations specific to election cases" that we must weigh for injunctive relief.  The Supreme Court has said that we must weigh "considerations specific to election cases[,]" in addition to the traditional considerations for injunctive relief.  *Purcell*, 549 U.S. at 4.  That caution is certainly sound because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls[,]" and "[a]s an election draws closer, that risk will increase." *Id.* at 4-5.  The focus of the *Purcell* principle, then, is on avoiding election issues that could lead to voter confusion shortly before an election.

In this case, however, the District Court's order would reduce, if not eliminate voter confusion and, for the reasons previously explained, the arguments made by the CCDC and its amicus, the MCRC, appear contrary to the record and based on nothing but speculation. The MCRC argues the change "will generate extensive voter confusion" because it will "deprive[] voters of expected information on their ballots." (MCRC Amicus Br. at 10.) No support is offered for that claim. Based on the District Court's factual findings – and unlike other cases in which *Purcell* is typically applied – implementing office-block style ballots does not impact voters' ability or plans for voting and would actually alleviate some ballot confusion. Further, as every one of the county clerks has abandoned this appeal, MCRC's other argument, that "[t]here is simply not enough time to properly implement such a significant change[,]" does not hold water.[14] (MCRC Amicus Br. at 11.)

---

[14] In addition, the Plaintiffs point out that the county clerks "are well underway in designing office-block ballots" and "have apparently received confirmation from their voting system vendors … that they can in fact design office-block ballots with minimal disruption." (Answering Br. at 47.) Besides, we do not view this as a last-minute election case. The Plaintiffs moved with the appropriate alacrity, bringing this suit over 100 days before the primary election and over a month before the ballot-printing deadline. And as the Plaintiffs correctly surmised, an earlier filing (perhaps before the announcement of official endorsements) would have raised the specter of the defendants raising a ripeness challenge.

Here again, the District Court's factual findings undermine the MCRC's assertions. The Court said that the county clerks could implement the necessary changes given the time available, and that finding is entitled to deference.

## III.   CONCLUSION

In sum, we will affirm the District Court's order granting the preliminary injunction because its findings of fact are substantiated, its conclusions of law are sound, and its "ultimate decision" granting the injunction presents no abuse of discretion. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 128 n.5 (3d Cir. 2024).